# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

ALEXANDER COTTO,
      Plaintiff,

No. 3:10-cv-560 (SRU)

      v.

CITY OF MIDDLETOWN, et al.,
      Defendants.

## RULING AND ORDER

The plaintiff, Alexander Cotto, brought a civil suit against the defendants, the City of Middletown and several of its police officers, asserting various federal and state claims related to their conduct during a traffic stop. (doc. 1) The matter proceeded to a jury trial against Lieutenant Richard Davis, Officer Lee Buller, Officer Daniel Schreiner, and Officer Jason Tetrault. After the close of Cotto's case, the defendants made a Rule 50 motion for judgment as a matter of law on certain counts. The jury found in favor of Cotto and awarded him nominal and punitive damages. (doc. 162) The jury then answered special interrogatories about the verdict. (doc. 163) The defendants renewed their Rule 50 motion for judgment as a matter of law, asserting that no reasonable jury could have found for Cotto on any of his Fourth Amendment and invasion of privacy claims or found the malicious intent required for an award of punitive damages, or alternatively, they argue that their actions were entitled to qualified immunity. (doc. 168)

For the foregoing reasons, the defendants' motion is **denied** in its entirety and the verdict is sustained. The amount of punitive damages awarded, however, must be reduced.

## I.      Standard of Review

Rule 50(b) of the Federal Rules of Civil Procedure allows for the entry of judgment as a

matter of law if a jury returns a verdict for which there is no legally sufficient evidentiary

basis. *See* Fed. R. Civ. P. 50. The standard under Rule 50 is the same as that for summary

judgment: A court may not grant a Rule 50 motion unless "the evidence is such that, without

weighing the credibility of the witnesses or otherwise considering the weight of the evidence,

there can be but one conclusion as to the verdict that reasonable [persons] could have reached."

*This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (citation and internal quotation

marks omitted). Thus, in deciding such a motion, "the court must give deference to all credibility

determinations and reasonable inferences of the jury . . . and it may not itself weigh the

credibility of the witnesses or consider the weight of the evidence." *Galdieri-Ambrosini v. Nat'l*

*Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) (citations omitted). In short, the court

cannot "substitute its judgment for that of the jury." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412,

429 (2d Cir. 1995) (citations omitted). Rather, judgment as a matter of law may only be granted

if:

> (1) there is such a complete absence of evidence supporting the verdict
>     that the jury's findings could only have been the result of sheer
>     surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in favor of the
>     movant that reasonable and fair minded persons could not arrive at a
>     verdict against it.

*Galdieri-Ambrosini*, 136 F.3d at 289 (quoting *Cruz v. Local Union No. 3 of the Int'l Bhd. of*

*Elec. Workers*, 34 F.3d 1148, 1154 (2d Cir. 1994)) (internal quotation marks omitted); *see*

*also Luciano v. Olsten Corp.*, 110 F.3d 210, 214 (2d Cir. 1997). The test on a Rule 50(b) motion

is not the strength or weakness of the evidence, but whether the evidence presented was such that

a "reasonable juror would have been compelled to accept the view of the moving party." *Densberger*, 125 F. Supp. 2d at 590 (citing *This Is Me Inc.*, 157 F.3d at 142).

When a jury has provided both a verdict and special interrogatories, and there is a potential inconsistency between the jury's pronouncements, "it is the duty of the district court to reconcile the jury's general verdict and its interrogatory responses if reasonable reconciliation is possible." *Kerman v. City of New York*, 374 F.3d 93, 121 (2d Cir. 2004); *see also Julien J. Studley, Inc. v. Gulf Oil Corp.*, 407 F.2d 521, 526–27) (2d Cir. 1969) ("[I]f it is discoverable that the jury might . . .  have found consistent grounds for its ultimate decision—if the findings, therefore, are not necessarily in conflict—the general verdict must be sustained.") (citations and quotations omitted).

## II.    Background and Procedural History

Cotto filed his complaint against the defendants on April 12, 2010. Trial began on January 6, 2014, and lasted five days.

### A. Evidence Adduced at Trial

Viewing the evidence put forth at trial in the light most favorable to the plaintiff, the jury could have found the following relevant facts.

Alexander Cotto is an American citizen who was born in Puerto Rico. Tr. at 39. He speaks Spanish, but he is completely illiterate and does not understand English. Tr. at 40. He has mild mental retardation. Tr. at 45. At the time of the incident, he was 34 years old, stood about five foot two, and weighed 140 pounds. Tr. at 51.

Cotto's wife usually drove him to work at night because he did not have a driver's license. Tr. 50. On the night of January 12, 2010, however, she was unable to drive him, so Cotto drove himself to work through downtown Middleton, Connecticut. Tr. at 54–55. It was a cold

evening, with temperatures in the low to mid thirties. Tr. 482. Around 10 p.m., Lieutenant Davis observed Cotto driving with his lights off, and pulled him over. Tr. at 289–90. Cotto parked his car on Green Street, approximately 100 feet from the Main Street intersection. Tr. 491. The location of the stop was in "plain view" of pedestrian traffic in the area. Tr. at 363. The incident was also captured by a video camera in a liquor store parking lot across the street. Ex. 12. The video demonstrates that Cotto was stopped in front of two residential houses, and across from another building and a parking lot that was used by several cars over the course of the search. *Id.*

Davis approached the car alone, without drawing his gun. Tr. at 337. Cotto's wife had instructed Cotto that if he was ever pulled over he should give the officer the papers in the car's console. Tr. at 58. Cotto behaved accordingly—when Davis came over to the car, he reached into the console and provided the papers that were there. Tr. at 59. He did not understand what Davis was saying to him, and responded in Spanish that he did not speak any English. *Id.* Although Cotto was unable to communicate, he was fully compliant throughout the search. Tr. at 481.

Davis then instructed Cotto to get out of the car, using hand gestures. Tr. 61. Davis placed Cotto's hands on top of the car, used his feet to spread Cotto's legs, and performed a thorough pat-down, including a manual over-the-clothes search of Cotto's genitals and buttocks. Tr. at 61–63. Although Davis found no weapons or contraband, and although he admittedly had no knowledge of Cotto's identity, Davis placed Cotto in handcuffs, sat him down on the sidewalk, and called for back-up. Tr. at 63. Buller, Tetrault, and Schreiner arrived. Tr. at 64. Davis did not indicate to the other officers either when they arrived or at any other point during the search that Cotto posed any kind of safety risk. Tr. at 492. At some point, Schreiner identified Cotto and incorrectly informed Davis that Cotto had previously been arrested for narcotics possession. Tr. at 461.

4

After the other officers arrived, Davis retrieved a narcotics-trained canine from his car and resumed searching Cotto. Tr. at 64.  The dog sniffed Cotto and positively alerted to his upper left thigh and buttocks. Tr. 430. Davis then commenced a second pat-down, including a search of Cotto's jeans that turned up money but no narcotics. Tr. at 67, 431. During the second pat-down, Davis felt between Cotto's buttocks with his finger but uncovered no weapons or contraband. Tr. at 68. Davis also kicked off and searched Cotto's shoes. Tr. at 83, 85. Although Davis did not find any evidence of weapons or contraband in Cotto's shoes, he did not return them for the duration of the search, leaving Cotto to stand handcuffed in socks on the street on a cold night. Tr. at 83–84.

Davis searched the inside of Cotto's car with the canine. Tr. at 72. He ripped the door panel, pulled up the floor mats, and opened compartments in the car, but again came up with no weapons or contraband. Tr. at 72–74. Davis then again searched Cotto's person using the dog, and began the third pat-down. Tr. at 72, 85. During the third pat-down, Davis pulled down Cotto's jeans all the way to his ankles. Tr. 83, 85. Underneath his jeans, Cotto was wearing pajama pants/sweatpants as underwear. Tr. at 56. The dog then sniffed Cotto again, and again altered positively to the pocket-area of his pajamas. Tr. at 80. Davis conducted a fourth pat-down, searching Cotto's pajama pockets and feeling his buttocks and genitals through the fabric with his fingers. Tr. at 87.

Although Davis once again did not find any weapons or contraband, he then pulled down Cotto's pajamas. Tr. at 85–86. As discussed further below, the jury rejected testimony that the pajamas/sweatpants were pulled all the way down to Cotto's knees, but Cotto's statements were sufficient for the jury to find that they had been pulled down or away from his body a sufficient

distance to expose Cotto's buttocks and genitals. *See* Tr. at 87–89.[1] Davis asked Tetrault, who was standing closest to him during the search, for his flashlight and Tetrault handed it over. Tr. at 433. Davis stated that he had no need to look at Cotto's genitals because if there was anything kept there, he would have felt it during the pat-downs. Tr. at 314. The jury could have found that he nevertheless used the flashlight to conduct a visual search of Cotto's genitals and buttocks. Tr. at 88. Once again, Davis found no evidence of weapons or contraband in the visual search.

Finally, Davis conducted a manual search of Cotto's bare buttocks and genitals, reaching in and feeling the area with his ungloved hand despite having gloves available in his car. Tr. at 89, 167–68, 434. Again, no evidence of contraband or weapons was found.

The entire stop and search took approximately one hour. Ex. 12. Despite periodic vehicular and pedestrian traffic, including people who could be seen on video to be slowing down to watch the search, *id.*, none of the defendants made any effort to protect Cotto's privacy or to shield him from public view, Tr. at 362–63, 470.  At one point, Davis referred to Cotto as a "Fucking Puerico," a slang term for Puerto Ricans. Tr. at 183.  And throughout the search, Buller, Tetrault, and Schreiner were talking and laughing. Tr. at 80. In particular, Cotto specified that they laughed at him when Davis pulled his pants down for the strip search. Tr. at 89, 90.

---

[1] The defendants incorrectly assert that "the only testimony about how far Mr. Cotto's waistband was pulled away from his body was from Lt. Davis" and further assert that Cotto's only testimony on the subject was about "whether or not his sweatpants were pulled down to his knees." Def. Reply Br. at 4. They assert that because the jury specifically found that the pants had not been pulled down to the knees, they necessarily rejected Cotto's testimony on the subject. But although plaintiff's counsel said in his opening statement that Cotto would testify he was "naked to his knees," Tr. at 28, Cotto himself never made any reference to his knees in his testimony. Instead, the defendants' argument is based on the following exchange between Cotto and defense counsel: "Q: He never pulled your pants all the way down to your knees, your pajamas, isn't that right? A: He pulled it down." Tr. at 167. As noted above, Cotto repeated the statement that Davis "pulled it down" at several other points in his testimony. *See* Tr. at 87–89. The jury could easily have rejected the contention that the pajamas were pulled "all the way down to [Cotto's] knees" and still have evidence to make a consistent finding that they were lowered a shorter distance that was still sufficient to expose Cotto's private parts to the public. For me to find otherwise would require an evaluation of witness credibility, which task falls exclusively to the jury. *Jean-Laurent v. Hennessy*, No. 05-cv-1155 (JFB)(LB), 2008 WL 3049875, at *18 (E.D.N.Y. Aug. 1, 2008).

Davis ultimately issued Cotto a ticket, had his car towed, and the defendants left the scene. Tr. at 322–26, 436. Cotto went to a hospital, complaining about pain in his rectum and lower legs resulting from the search. Tr. at 98–99.

B.  <u>Jury Verdict and Interrogatories</u>

The jury was instructed on section 1983 claims against Davis for unreasonable seizure, Tr. at 601–07, and for an unreasonable search, Tr. 607–09. In particular, the jury was instructed that it should find the search was unreasonable if it found either that Cotto was not lawfully detained, or that Davis had no reasonable suspicion to conduct the search, or that the search was not done in a reasonable manner. *Id.* It was also instructed on section 1983 claims against Buller, Tetrault, and Schreiner for failure to intervene, Tr. at 609, and claims against all of the defendants for intentional or negligent infliction of emotional distress, Tr. at 611–16, and invasion of privacy, Tr. at 616. The jury was also instructed on compensatory, nominal, and punitive damages. Tr. at 616–22.

The jury returned a verdict largely in favor of Cotto. *See* Tr. at 714–16. doc. 162. Specifically, it found that Cotto had proved his claims of unreasonable search against Davis, the failure to intervene claims against the other defendants, and the invasion of privacy claims against all defendants, but that he had failed to prove an unreasonable seizure or either of the emotional distress claims. It awarded $1,000 in nominal damages, and a total of $60,000 in punitive damages from all of the defendants—$40,000 from Davis, $10,000 from Tetrault, and $5,000 each from Buller and Schreiner.

The jury was then asked to answer specific interrogatories, which it did as follows:

The COURT:

[Interrog. #1] Did Lieutenant Richard Davis have probable cause to arrest Mr. Cotto for driving without an operator's license,

7

making an illegal U-turn, or operating a motor vehicle without headlights?

Yes.

[Interrog. #2] Did Lieutenant Richard Davis have reasonable suspicion to suspect that Mr. Cotto was armed and dangerous which justified a pat down of Mr. Cotto when he exited his vehicle?

Yes.

[Interrog. #3] Was the canine, Rika, certified to detect the odor of narcotics?

Yes.

[Interrog. #4] Did Mr. Cotto rebut the presumption of the canine Rika's reliability as a detector of narcotics?

The answer there is "Yes," and then the note next to it is, "But unsuccessfully." Is that an indication that the effort to rebut was made but it was not rebutted? Or –

The FOREPERSON:

We recognize that there was an attempt to rebut but it was unsuccessful. We didn't want the Court to believe that we did not understand that there was an attempt.

. . . .

The COURT:

[Interrog. #5] Did the canine Rika alert to Mr. Cotto's jeans?

Yes.

[Interrog. #6] Did the canine Rika alert to Mr. Cotto's sweatpants/pajamas?

Yes.

[Interrog. #7] Did Lieutenant Richard Davis pull Mr. Cotto's sweatpants to his knees?

No.

8

[Interrog. #8] Did Lieutenant Richard Davis perform a strip search of Mr. Cotto?

Yes.

[Interrog. #9] Did Lieutenant Richard Davis perform a body cavity search of Mr. Cotto?

No.

[Interrog. #10] Was Mr. Cotto unlawfully (sic)[2] detained?

Yes.

[Interrog. #11] Did Lieutenant Richard Davis have reasonable suspicion that Mr. Cotto was concealing weapons or other contraband?

Yes.

[Interrog. #12] Was the strip search, if any, performed in a reasonable manner?

No.

[Interrog. #13] Was the body cavity search, if any, performed in a reasonable manner?

And the answer is "Not Applicable."

[Interrog. #14] Did Lieutenant Richard Davis place his fingers into Mr. Cotto's rectum?

No.

Tr. at 719 –21. The defendants subsequently filed this renewed motion for judgment as a matter of law. (doc. 168)

## III.    Discussion

The defendants make five arguments for judgment as a matter of law: (1) no reasonable jury could have found that Davis' search was unreasonable; (2) no reasonable jury could have found that Buller, Tetrault, and Schreiner's failure to intervene was unreasonable; (3) no

---

[2] The interrogatory itself asked if Cotto was *lawfully* detained, to which the jury answered yes.

reasonable jury could have found malicious intent sufficient to subject the defendants to punitive damages; (4) if a jury could have found either of the substantive claims, the defendants were nevertheless entitled to qualified immunity; and (5) no reasonable jury could have found the elements of the invasion of privacy tort. Additionally, although it was not raised by the defendants, I consider whether the amount of punitive damages awarded is excessive.

A. Unreasonable Search (Davis)

The jury was instructed that it should find that Davis had conducted an unreasonable search if any of the following obtained: (1) Cotto had been unlawfully detained; (2) Davis lacked a reasonable suspicion to conduct the search; or (3) Davis had conducted the search in an unreasonable manner. In its initial verdict, the jury found that Davis had conducted an unreasonable search. In the special interrogatories, the jury specified that Davis had not pulled Cotto's pajamas "to his knees" (Interrog. 7), but that he had conducted a strip search (Interrog. 8). The jury further specified that Cotto was lawfully detained (Interrog. 10) and that Davis had "reasonable suspicion that Mr. Cotto was concealing weapons or other contraband" (Interrog. 11), but that the strip search was not "performed in a reasonable manner" (Interrog. 12).

The defendants now contend that, on the basis of the evidence at trial as well as the factual findings implied by the jury's interrogatory responses, no reasonable jury could have found Davis' strip search to be a violation of the Fourth Amendment.[3]

---

[3] The defendants rely on both legal and factual arguments; however, their factual arguments uniformly run contrary to the standard of review for a Rule 50(b) motion, which requires me to view the facts in the light most favorable to the non-moving party and to draw every reasonable inference that would allow me to sustain the verdict. *Densberger*, 125 F. Supp. 2d at 590. Specifically, the defendants assert that "the jury could reasonably have found that" Cotto's sweatpants "remained up at all times," that Cotto's genitals were never exposed to the public or to any of the other officers, that Cotto was "partially shielded from view by the surrounding officers and the vehicle parked along the curb line," and that the search took place on a dark street with minimal traffic. Defs.' Br. at 4, 27, 32. Although the jury *could* have found those facts, the defendants have not shown that the evidence *compelled* it to do so, nor have they shown that the jury actually did make such findings in order to come to the conclusions expressed in its verdict and interrogatory responses. Accordingly, those facts are not controlling in my analysis; instead, the

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const., Amend. IV. To effectuate that protection, a police officer is generally required to obtain a warrant from a judicial officer before conducting a search. *See California v. Carney*, 47 U.S. 368, 390 (1985); *New York v. Belton*, 453 U.S. 454, 457 (1981). Relevant to the present case,[4] the Supreme Court has identified a search incident to arrest as a traditional exception to the warrant requirement. *See Chimel v. California*, 395 U.S. 752, 762–63 (1969). That exception is supported by two historical rationales: "(1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial." *Knowles v. Iowa*, 525 U.S. 113, 116 (1998) (collecting cases). It does not, however, insulate searches incident to a valid arrest from a further reasonableness inquiry. *See id.* at 117.

"A 'strip search' occurs when a suspect is required to remove his clothes." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013) (citing *People v. Hall*, 886 N.E. 2d 162 (N.Y. 2008)). A strip search is considered to be "an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual." *Rivera v. United States*, 928 F.2d 592, 607 (2d Cir. 1991) (citations omitted); *see also Bolden v. Village of Monticello,* 344 F. Supp. 2d 407, 417 (S.D.N.Y. 2004) ("A strip search—even without any type of body cavity examination—has

---

relevant inquiry here is whether the jury could reasonably have found a violation of the Fourth Amendment on the basis of the evidence adduced at trial and set out above.

[4] This ruling proceeds under the assumption that the jury found that Cotto was subject to a lawful arrest when it found that Cotto had failed to prove that he was unreasonably seized. The verdict is actually ambiguous on that point—the jury was instructed that it could find for the defendants on the question of seizure if *either* Cotto was arrested based on probable cause *or* if he was not arrested, Tr. at 606, and the grounds on which they found for the defendants on the seizure question were not illuminated in the Interrogatories. Cotto correctly points out that it is debatable whether an encounter that does not end in booking or a formal arrest may be considered an "arrest" sufficient to trigger the search-incident-to-arrest standard. *See* Pl.'s Br. at 20–21 (citing *Wilson v. Aquino*, 5:01-cv-1597 (DFP) (doc. 102) (N.D.N.Y. Oct. 5, 2005) (discussing *Knowles v. Iowa*, 525 U.S. 113 (1998)). The search-incident-to-arrest standard for a search is far more generous towards police officers than what is allowed for a *Terry* frisk; because I conclude that the verdict may be upheld even under that standard, in this case there is no need for me to wade into the muddy distinctions between an investigative detention under *Terry* and a "formal arrest."

always been viewed as an extraordinary invasion of privacy requiring consideration of the 'totality of circumstances' . . . .").

In *Bell v. Wolfish*, 441 U.S. 520 (1979), the leading Supreme Court case considering the Fourth Amendment requirements for a strip search, the Court established the following guidelines:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559. Because the first and third prongs of the *Bell* test—scope and justification—are closely related, and because the second and fourth prongs—manner and place—are similarly intertwined, I will consider the *Bell* factors in two steps. Although Davis' actions may have been appropriate on the former axis, he violated the latter by conducting the search in an unreasonable manner; accordingly, the jury's verdict on the unreasonable search claim may stand.

### 1. *Scope and Justification*

As discussed above, "[t]he [Fourth] Amendment's protection is not diluted in those situations where it has been determined that legitimate law enforcement interests justify a warrantless search: the search must be limited in scope to that which is justified by the particular purposes served by the exception." *Florida v. Royer*, 460 U.S. 491, 500 (1983). A strip search is "viewed as an extraordinary invasion of privacy." Accordingly, "the Second Circuit has exhibited considerable regard for the right of any person . . . not to be subjected to a strip search unless there exists particularized suspicion that an individual is secreting contraband." *Bolden v. Vill. of Monticello*, 344 F. Supp. 2d 407, 417 (S.D.N.Y. 2004) (collecting cases); *see also United States v. Gonzalez*, No. 08 CR. 363 (BSJ), 2009 WL 613201, at *7 (S.D.N.Y. Mar. 4, 2009),

*aff'd,* 470 F. App'x 2 (2d Cir. 2012) ("Before an arrestee may be lawfully subjected to a strip

search, the Fourth Amendment requires an individualized 'reasonable suspicion that an arrestee

is concealing weapons or other contraband based on the crime charged, the particular

characteristics of the arrestee, and/or the circumstances of the arrest.'") (quoting *Hartline v.*

*Gallo,* 546 F.3d 95, 100–01 (2d Cir. 2008)).

The jury found that Davis performed a strip search of Cotto, but did not perform a body

cavity search. Interrogs. 8, 9. The jury also found that Davis had "reasonable suspicion" that

Cotto was concealing weapons or contraband, although the Interrogatory did not specify the time

when that "reasonable suspicion" existed. Interrog. 11.

The defendants assert that the jury's affirmative responses to Interrogatory 11 and

Interrogatory 2, which asks whether Davis had "reasonable suspicion to suspect Mr. Cotto was

armed and dangerous . . . when he exited his vehicle," clearly indicate that the jury found the

strip search itself to be justified. *See* Defs.' Reply Br. at 3. Arguably, the manner in which

Interrogatory 11 is drafted renders it insufficient to provide the "particularized suspicion"

required to justify a strip search. The Interrogatories are presented seemingly in chronological

order, meaning that they progress from questions about Davis' initial stop and pat-down to the

canine sniff to the strip search, and Interrogatory 11 is presented amidst other questions specific

to the strip search; on the other hand, the plain texts of the question itself makes no mention of

whether the "reasonable suspicion" to which it refers applied to the strip search itself. Cotto also

points to Davis' statement that he knew there were no objects in Cotto's buttocks after he

completed his pat-downs, *see* Tr. at 314, as proof that Davis had no particularized suspicion

whatsoever to justify the search after that point. *See* Pl.'s Br. at 16, 19.

Although Cotto is correct that the jury *could* have deemed Davis' testimony to be such an admission, the defendants' argument appears to be more consistent with the jury's affirmative response on Interrogatory 11, as well as its finding that the narcotics dog alerted to Cotto's pajamas and was reliable. Because there is another basis for upholding the verdict here—namely, the jury's finding that the search was not conducted in a reasonable *manner*—I will assume without deciding that the jury found that Davis did have a sufficient particularized suspicion to justify the scope of the strip search, including as component parts the visual search and the reach-and-feel.[5]

### 2.  *Manner and Place*

*Bell* itself observes that a search justified in scope may nevertheless violate the Fourth Amendment if it is conducted in an unreasonable manner. *See Bell*, 441 U.S. at 560 (citing

---

[5] Despite that assumption, I note that if the jury did, in fact, find that Davis had sufficient justification to strip search Cotto, that finding may well violate Second Circuit law. *See Hartline v. Gallo*, 546 F.3d 95, 101 (2d Cir. 2008) (holding that an officer did not have sufficient reasonable suspicion to strip search a subject who had been charged with misdemeanor possession of "unusable bits of marijuana;" cautioning that "if the facts of this case amount to reasonable suspicion, then strip searches will become commonplace").

   In particular, I am highly skeptical that Davis had the appropriate justification to reach in and feel Cotto's bare genitals and buttocks with his ungloved hand. The defendants' argument on that point is almost uniformly off base. Nearly all of the cases in the "Pull Out and Reach In" portion of their brief involve an officer reaching into a subject's clothing only *after* independently determining that there was a foreign object in the subject's private area. *See, e.g., United States v. Gonzalez*, No. 08 CR. 363 (BSJ), 2009 WL 613201, at *8 (S.D.N.Y. Mar. 4, 2009), *aff'd*, 441 F. App'x 31 (2d Cir. 2011), *and aff'd*, 470 F. App'x 2 (2d Cir. 2012) (item in plain view on visual search); *United States v. Ashley*, 37 F.3d 678, 679 (D.C. Cir. 1994) (item felt through outer clothing, visible above underwear); *United States v. Robinson*, No. 1:08-CR-74-TS, 2009 WL 2106147, at *15 (N.D. Ind. July 13, 2009), *aff'd*, 615 F.3d 804 (7th Cir. 2010) (item felt through outer clothing, and because item had already been located and identified by the officer, court characterized the reach-in as a retrieval instead of a search); *United States v. Bazy*, No. 94-40018-01-SAC, 1994 WL 539300, at *3 (D. Kan. Aug. 29, 1994), *aff'd*, 82 F.3d 427 (10th Cir. 1996) (item felt through outer clothing); *United States v. Gordon*, No. 2:04-CR-688, 2008 WL 3540007, at *2 (D. Utah Aug. 13, 2008) (item felt through outer clothing); *Harden v. Flowers*, No. 01 C 7878, 2003 WL 1989616, at *2 (N.D. Ill. Apr. 29, 2003) (informant indicated location of item, and item felt through outer clothing); *United States v. Burnett*, No. 09-4003-04CR-C-NKL, 2009 WL 2835751, at *2 (W.D. Mo. Aug. 31, 2009) (item felt through underwear); *United States v. Williams*, 209 F.3d 940, 944 (7th Cir. 2000) (item felt through outer clothing); *State v. Smith*, 118 N.C. App. 106, 108, 454 S.E.2d 680, 682, *writ allowed*, 340 N.C. 362, 458 S.E.2d 196 (1995), *and rev'd*, 342 N.C. 407, 464 S.E.2d 45 (1995) (informant indicated location of item, item visible on visual search of genitals); *but see Dominguez v. Metro. Miami-Dade Cty.*, 359 F. Supp. 2d 1323, 1339–40 (S.D. Fla. 2004), *aff'd*, 167 F. App'x 147 (11th Cir. 2006) (gloved manual search without prior confirmation, resulted in indirect gloved touching of subject's vagina and rectum); *Cross v. City of Chicago*, No. 03 C 4265, 2004 WL 2644405, at *8 (N.D. Ill. Nov. 19, 2004) (gloved manual search without prior confirmation).

*Schmerber v. California*, 384 U.S. 757, 771–72 (1966)); *see also Galluccio v. Holmes*, 724 F.2d 301, 304 (2d Cir. 1983) ("Appellees are not shielded by the warrant from liability under 42 U.S.C. § 1983 if the warrant was executed in an unreasonable manner."); *Wang v. Vahldieck*, No. 09-CV-3783 (ARR) (VVP), 2012 WL 119591, at *10 (E.D.N.Y. Jan. 9, 2012) ("[A] search incident to a lawfully executed arrest may still violate the Fourth Amendment, if conducted in an otherwise unreasonable manner."); *Ivey v. Lyman*, No. 902-CV-470, 2005 WL 1397134, at *3 (N.D.N.Y. June 1, 2005) (same); *Bolden v. Vill. of Monticello*, 344 F. Supp. 2d 407, 416 (S.D.N.Y. 2004) ("No search warrant shields a police officer from carrying out a search in an unreasonable manner or from employing excessive force during a search. It would be frivolous for defendants to argue otherwise.").

Accordingly, a finding in the defendants' favor on the scope and justification factors is not dispositive—courts in this circuit have routinely held a search that is justified in scope could nevertheless violate the Fourth Amendment if it was conducted in an unreasonable manner or at an unreasonable location. *See, e.g.*, *Wilson v. Aquino*, 233 F. App'x 73, 76 (2d Cir. 2007); *Campbell v. Fernandez*, 54 F. Supp. 2d 195, 198 (S.D.N.Y. 1999); *Thomas v. O'Brien*, No. 5:08-CV-0318NAM/DEP, 2010 WL 3155817, at *7 (N.D.N.Y. Aug. 9, 2010). A strip search in a public place, even if justified by reasonable suspicion, has been uniformly subject to close scrutiny, and has generally required a clear showing of exigent circumstances to justify such an extreme invasion of privacy. *See Illinois v. Lafayette*, 462 U.S. 640, 645 (1983) (observing that "the interests supporting a search incident to arrest would hardly justify disrobing an arrestee on the street"); *Rivera v. United States*, 928 F.2d 592, 606–07 (2d Cir. 1991) (reversing district court's grant of summary judgment to police officers on Fourth Amendment claim in part because officers "perform[ed] a publicly observable strip search"); *Moore v. Hearle*, 639 F.

Supp. 2d 352, 357 (S.D.N.Y. 2009) ("[A] partial strip search in a public place where passersby can see a person's naked body is not reasonable absent serious safety concerns."); *see also Campbell v. Miller*, 499 F.3d 711, 719 (7th Cir. 2007) ("Courts across the country are uniform in their condemnation of intrusive searches performed in public.") (collecting cases).

Here, the jury specifically found that the strip search was conducted "in an unreasonable manner." Interrog. 12. Based on the evidence at trial, it could reasonably have found that the search was conducted as follows: Davis, making no effort to communicate with Cotto who clearly could not understand English, searched him for nearly an hour. During the search, Davis removed Cotto's jeans and shoes, pulled down his pajamas and exposed him to the street, and used his bare, ungloved hand to feel Cotto's buttocks and genitals despite knowing that gloves were easily available in his car. Davis did not return Cotto's shoes after he had determined that they did not contain contraband, but instead left Cotto to stand in his socks on a cold street for an extended period of time. Davis also aimed a racial epithet and an obscenity at Cotto.

The location of the search is bound up with the unreasonable manner in which it was conducted. The jury could reasonably have found that the strip search took place on a public street, in view of both pedestrian and vehicular traffic, as well as commercial and residential buildings, and that neither Davis nor any of the other defendants made any effort to shield Cotto from view.

Several of the above facts would support the jury's finding that the strip search was conducted in an unreasonable manner. First, Davis's verbal attack on Cotto, referring to him as a "fucking Puerico," plainly supports a finding of unreasonableness. *See Campbell*, 54 F. Supp. 2d at 197 (declining to grant summary judgment in favor of the defendants where a jury could find that they, *inter alia*, "taunted the two men (both of them black) about the size of their penises and

addressed them by racial epithets during the search"); *Ivey*, 2005 WL 1397134, at *2 (same); *see also Thomas*, 2010 WL 3155817, at *7 (declining to grant summary judgment in favor of the defendants where a jury could find, *inter alia*, that the defendants "verbally harassed plaintiff" during a *Terry* stop); *see also Wilson*, 233 F. App'x at 78 (holding that the defendants' verbal abuse of the subject during the search supported an award of punitive damages).

Davis' wholly unexplained decision to use his ungloved hands to feel Cotto's buttocks and genitals despite the easy availability of gloves in his car is similarly unreasonable. *See Amaechi v. West*, 237 F.3d 356, 365–66 (4th Cir. 2001) (asserting that an officer's "touching and penetration of [the plaintiff's] exposed genitalia with his ungloved hand affronts the basic protections of the Fourth Amendment"). In stark contrast to the present case, in nearly all of the cases collected by the defendants in which a reach-and-feel search was found to be reasonable, the court approvingly highlighted the officer's use of gloves as a clear sign that the search was conducted in an appropriate manner. *See, e.g.*, *United States v. Williams*, 209 F.3d 940, 944 (7th Cir. 2000) (highlighting the officer's use of gloves); *United States v. Bazy*, No. 94-40018-01-SAC, 1994 WL 539300, at *7 (D. Kan. Aug. 29, 1994), *aff'd,* 82 F.3d 427 (10th Cir. 1996) (same); *United States v. Gordon*, No. 2:04-CR-688, 2008 WL 3540007, at *2 (D. Utah Aug. 13, 2008) (same); *Cross v. City of Chicago*, No. 03 C 4265, 2004 WL 2644405, at *8 (N.D. Ill. Nov. 19, 2004) ("[The strip search] appears to have been done in a professional manner. [The officer] wore gloves . . . .").

Davis' decision to conduct the strip search in a public place, in full view of bystanders, without making any effort whatsoever to block Cotto from view provides perhaps the strongest support for the jury's finding of unreasonableness. Courts in this circuit have routinely held that "a partial strip search in a public place where passersby can see a person's naked body is not

17

reasonable absent serious safety concerns." *Moore v. Hearle*, 639 F. Supp. 2d 352, 357 (S.D.N.Y. 2009); *see also Jean-Laurent v. Hennessy*, No. 05CV1155(JFB)(LB), 2008 WL 3049875, at *14 (E.D.N.Y. Aug. 1, 2008) (declining to grant summary judgment in favor of the defendants where a reasonable jury could find, *inter alia*, that the strip search was conducted on a public street without justification for that location); *Thomas*, 2010 WL 3155817, at *9 (same, on the front porch of a residence); *see also Campbell*, 499 F.3d at 718 ("Having decided, legitimately, to conduct this type of search, the police inexplicably did not even afford Campbell the dignity of doing it in a private place."). The defendants correctly point out that some of those cases involved more egregious conduct—Cotto was not made to spread his buttocks and jump up and down, as in *Moore*, nor was he subjected to additional physical violence and cavity searches, as in *Jean-Laurent* and *Thomas*; that Cotto was spared those additional abuses, however, does not somehow obviate the obvious humiliation of a strip search conducted on a public street, in plain view of passersby. Moreover, the defendants' own brief underscores the unreasonableness of Davis' failure to make any effort to protect Cotto from view—in each of cases cited upholding the reasonableness of a strip search conducted in an open environment, the defendants note in parentheticals that officers in those cases made some effort to protect the subject's privacy. *See* Defs.' Br. at 25–26.

In sum, it appears that the defendants are not arguing—as indeed they cannot argue—that an officer-imposed public strip search in plain view of pedestrian and vehicular traffic with no effort to shield the subject is reasonable. Instead, they argue for a different reading of the facts. *See* Defs.' Br. at 24 (asserting, *inter alia*, that Cotto's "private parts were never exposed and there was at least a partial barrier around the plaintiff"); *id*. at 27 (asserting that "Davis took measures to ensure privacy."). But again, the defendants misunderstand the standard for factual

arguments at this stage of the case—they have failed to show that the jury was compelled to make those factual findings, particularly given that Davis and the other defendants freely admitted that they made no effort to protect Cotto from view.

Intermittently, the defendants also suggest that the manner and location of the search, even if otherwise unreasonable, could have been justified by exigent circumstances. They argue first that it was "undisputed that Lt. Davis had a reasonable suspicion that Mr. Cotto was armed and dangerous," Defs.' Br. at 33, although the jury's finding was limited to the moment when Cotto exited the vehicle.[6] The defendants have failed to demonstrate that the jury was also compelled to find, or actually did find, that Cotto remained a security threat once he was handcuffed and subjected to multiple pat-downs. Instead, based on Cotto's comparatively small stature, his compliance throughout the search, the defendants' total lack of communication about whether Cotto posed a threat, and based on Davis' failure to request their physical assistance during the search, the jury could have reasonably found that by the time of the strip search, Cotto was not a security threat.

The defendants also argue that an immediate and public strip search was necessary to prevent Cotto from either pushing the never-located contraband deeper into his buttocks or discarding it in the patrol car. Defs.' Br. at 28, 33. But Cotto was wholly compliant, handcuffed, and surrounded by officers. In *Wilson v. Aquino*, 233 F. App'x 73 (2d Cir. 2007), the Second Circuit rejected a similar argument as "at best, speculative." *Id.* at 76; *see also Thomas*, 2010 WL 3155817, at *10 (rejecting a similar argument in the context of a search of a known drug dealer as "objectively unreasonable"). *Wilson* is narrowly distinguishable from the present case,

---

[6] Interrogatory 11 asked whether Davis had a reasonable suspicion that Cotto was concealing "weapons or other contraband." Because it did not ask the jury to distinguish between those categories, the jury's affirmative answer could reasonably have referred to a suspicion that Cotto was concealing narcotics rather than a weapon, which would have been wholly consistent with Davis' persistent use of a narcotics-sniffing dog.

because the narcotics-sniffing dog there had not alerted to the plaintiff's person at all. Nevertheless, to seriously credit the defendants' argument that as a matter of law it should be assumed that a small, handcuffed man could somehow, on the way to the police station, dispose of evidence lodged so deeply in his buttocks that it was not detectable after four pat-downs would give officers license to claim "exigent circumstances" and publicly strip search any individual suspected of narcotics possession. There are instances where the subject of a search has already shown an ability and inclination to dispose of evidence during an arrest—this is simply not one of them.

In sum, the defendants have failed to show, under the *Bell* test, that the jury was compelled to find that Davis strip searched Cotto in a reasonable manner. Accordingly, that portion of the verdict is sustained.

B. Unreasonable Failure to Intervene (Buller, Tetrault, and Schreiner)

The jury was instructed on section 1983 claims against Buller, Tetrault, and Schreiner for failure to intervene. Tr. at 609. It found in favor of Cotto on those claims, and was not asked to clarify that portion of the verdict in the interrogatories. The defendants now contend that, on the basis of the evidence at trial, no reasonable jury could have could have found the defendants' failure to intervene to be a violation of the Fourth Amendment.

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (collecting cases). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that any constitutional violation has been committed by a law enforcement official." *Id.* (citing *O'Neill v.*

*Krzminski*, 839 F.2d 9, 11 (2d Cir. 1988)). "Liability may attach only when (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)*, aff'd sub nom. Jean-Laurent v. Wilkerson*, 461 F. App'x 18 (2d Cir. 2012).[7] Even officers who do not actively participate in a strip search may still be found liable for a failure to intervene if they had a reasonable opportunity to do so. *Jean-Laurent*, 2008 WL 3049875, at *14–15.

Based on the evidence adduced at trial, the jury could have found that Buller, Tetrault, and Schreiner stood by and laughed at Cotto while Davis was publicly strip-searching him, making no effort to shield him from plain view of the public. It could have found that the three officers were within earshot of Davis when he referred to Cotto as a "fucking Puerico." Moreover, the jury could have found that when Davis asked Tetrault, who was standing closest to him, for his flashlight, he put the three officers on notice that he was about to conduct a visual, and perhaps even a manual genital search of Cotto in plain view of the public.

The jury reasonably found that the three officers had a clear opportunity to intervene in the strip search: they could have stopped or taken over the search from Davis after he swore at Cotto; they could have encouraged Davis to move the search out of the cold and into a private location as soon as Davis began removing Cotto's shoes and jeans; or they could have, at the bare minimum, blocked Cotto from view with their bodies during the strip search, an action that would have taken mere seconds to complete. Additionally, Tetrault could have declined to provide Davis with his flashlight until Cotto was given some privacy, and any of the officers

---

[7] Anticipating the qualified immunity discussion below, I note that those factors blur distinctions between the question whether the defendants had a duty to intervene at all, and whether their failure to intervene is nevertheless protected by qualified immunity.

could have quickly obtained gloves from the squad car. But the three officers admit that they took none of those actions, and do not assert that they made any other efforts to intervene.

As set out at length above, conducting a public strip search absent exigent circumstances is a clearly established violation of the Fourth Amendment. Moreover, the officers' own reactions underscore what reasonable people in their position would have known—that Cotto's rights were being violated. They laughed at Cotto, and in particular, they laughed when his pajamas were pulled down and his private areas were exposed to the street.

Accordingly, that portion of the verdict is sustained.

C. Punitive Damages

"Punitive damages are available in a § 1983 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

The jury was instructed on the availability of punitive damages for section 1983 claims against any of the defendants it found had acted "maliciously or wantonly." Tr. at 622. It awarded punitive damages against all of the defendants, and was not asked to clarify that award in the interrogatories. The defendants now contend that, on the basis of the evidence at trial, no reasonable jury could have could have found the defendants' conduct was sufficiently malicious to support an award of punitive damages.

The defendants' proffered argument assumes their victory on the Fourth Amendment claims, resulting in a finding of a finding of "reasonableness," that, they argue, precludes the imposition of punitive damages. Defs.' Br. at 49–50. They offer no alternative arguments should the jury's finding of unreasonableness be upheld, as it is here.

Moreover, as Cotto points out, the record is replete with evidence from which the jury

could infer the defendants' malicious intent. *See* Pl.'s Br. at 55. Davis made no effort to

communicate with Cotto during an hour-long search. He used an obscenity and an ethnic slur

against Cotto during the search. He made Cotto stand in the cold on a public street without shoes

and stripped to his undergarments, making no effort to protect his privacy. He then publicly

stripped Cotto and, despite having gloves close by and available, used his ungloved hand to

touch Cotto's bare buttocks and genitals. The other defendants stood by and laughed at Cotto,

particularly when he was strip-searched. Although they were present and not otherwise occupied,

they, too, made no effort to shield him from public view. The jury could easily have found that

there was no justification besides maliciousness for such an extended, invasive, and publicly

humiliating search. *See Gonzalez v. City of Schenectady*, No. 1:00-CV-0824, 2002 WL

34945084, at *7 (N.D.N.Y. Dec. 30, 2002) (upholding an award of punitive damages where the

jury could find malice "based upon the defendant's knowledge and acquiescence of what was

occurring, and/or from the insults that were hurled at the plaintiff during the search," as well as

based on the needlessly humiliating manner in which the search was conducted); *see also Wilson

v. Aquino*, 233 F. App'x 73, 77–78 (2d Cir. 2007) (upholding an award of punitive damages

where the defendant-officers verbally abused subject during the search, physically taunted him,

and used physical violence during the forcible removal of clothing).

Accordingly, the awarding of punitive damages is sustained.

D.   Qualified Immunity

The defendants contend that all of the defendants were protected from liability by

qualified immunity.

The doctrine of qualified immunity protects government officials from suit if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The issues on qualified immunity are: (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was "objectively reasonable" for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (citation omitted). The qualified immunity inquiry must be limited to the law at the time of the alleged violation, and "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

With respect to the specific elements of the qualified immunity inquiry, the analysis above establishes that a constitutional violation has been shown, so that question will not be discussed further. "To be 'clearly established,' '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Gonzalez*, 728 F.3d at 154 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). "In determining whether a right is clearly established, [courts] consider (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *McGarry v. Pallito*, 687 F.3d 505, 512 (2d Cir. 2012) (internal quotation and citation omitted). Directly responsive binding authority is not required, however; courts may "treat the law as clearly established if decisions from this or other circuits clearly foreshadow a particular ruling on the issue." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014)*, cert. denied sub nom. Torresso v.*

*Terebesi*, 135 S. Ct. 1842 (2015) (internal quotation marks and citations omitted). "In assessing objective reasonableness, we look to whether officers of reasonable competence could disagree on the legality of the defendant's actions." *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997) (internal quotation and citation omitted). In sum, "[w]hen properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al–Kidd,* 563 U.S. 731, 131 S. Ct. 2074, 2085 (2011) (internal quotation and citation omitted).

     1.  *Davis*

The defendants assert that Davis is protected by qualified immunity because: (1) there is an absence of "clearly established" law delineating when a public strip search is unreasonable, Defs.' Br. at 43–47; and (2) in the alternative, it was objectively reasonable for Davis to believe the strip search did not violate the Fourth Amendment, Defs.' Br. at 47–48.

The first argument is clearly unavailing. It relies heavily on language from the Supreme Court's recent ruling in *Ashcroft v. al–Kidd*, 563 U.S. 731 (2011), that, the defendants seem to suggest, heightens the requirements for "clearly established" law. But the Second Circuit has retained its previous qualified immunity standards, apparently with the approval of the Supreme Court. *See, e.g.*, *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (retaining the same standard after *al–Kidd*), *cert. denied sub nom. Torresso v. Terebesi*, 135 S. Ct. 1842 (2015).

Moreover, even though Fourth Amendment case law is often highly-fact specific, that does not mean it produces no "clearly established" law. As set out above, courts in both this circuit and across the country are in agreement about the following propositions: (1) a strip search violates the Fourth Amendment if it is conducted in an unreasonable place and manner, *see, e.g.*, *Galluccio*, 724 F.2d at 304; *Wilson*, 233 F. App'x at 76; and (2) it is unreasonable to conduct a strip search in full view of the public without exigent circumstances, *see, e.g.*,

*Lafayette*, 462 U.S. at 645; *Rivera*, 928 F.2d at 606–07; *Campbell*, 499 F.3d at 719 ("Courts across the country are uniform in their condemnation of intrusive searches performed in public.") (collecting cases).

Given the lack of ambiguity, particularly with respect to the unreasonableness of a wholly public strip search where Davis did not even request that the other officers offer the minimal protection of using their bodies to shield Cotto from the street, it was not objectively reasonable for Davis to believe that his actions did not violate the Fourth Amendment. *See Rivera*, 928 F.2d at 606–07; *see also Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir. 1981) ("We think that, as a matter of law, no police officer in this day and time could reasonably believe that conducting a strip search in an area exposed to the general view of persons known to be in the vicinity whether or not any actually viewed the search is a constitutionally valid governmental invasion of (the) personal rights that (such a) search entails.").

Conducting a strip search despite a wholly unjustified lack of privacy violates clearly established law and defeats Davis' claim of qualified immunity. Davis' unreasonable conduct also included additional egregious factors—namely, his use of a racial epithet and obscenity, as well as his ungloved reach-and-feel search. The Second Circuit has not directly ruled on those factors in an analogous context; however, its precedent, as well as rulings from other circuits, "clearly foreshadow" a Second Circuit holding that such conduct is objectively unreasonable. *See Wilson*, 233 F. App'x at 78 (holding that the defendants' verbal abuse of the subject during the search supported an award of punitive damages); *Amaechi*, 237 F.3d at 365–66 (asserting that an officer's "touching and penetration of [the plaintiff's] exposed genitalia with his ungloved hand affronts the basic protections of the Fourth Amendment"). Indeed, it is hard to imagine any possible justification for an ungloved search in a situation comparable to this case, where Davis

knew gloves were easily available nearby and Cotto was handcuffed, heavily outnumbered, and wholly compliant.

In fact, the jury could reasonably have found Davis was knowingly violating the law, given that his actions included swearing at Cotto and clearly violating department policy to conduct strip searches "only . . . under exigent circumstances where the life of officers or others may be placed at risk." *See* Pl.'s Mem., Ex. 1.

Accordingly, Davis is not entitled to qualified immunity, and Cotto may recover damages from him personally.

### 2. *Buller, Tetrault, and Schreiner*

The defendants assert that Buller, Tetrault, and Schreiner are entitled to qualified immunity.

The primary violation inquiry for an unreasonable failure to intervene heavily overlaps with the qualified immunity discussion because it requires consideration of whether a reasonable person would have known that the plaintiff's rights were being violated and would have had a reasonable opportunity to do something about it. I have already determined that Davis' manner of conducting the search was objectively unreasonable under clearly established law. Further, I have already determined that the other officers could not reasonably have believed otherwise, and that their laughter during the strip search could have led the jury to find that they were knowingly assisting Davis in breaking the law by refusing to offer Cotto cover or other basic protections. In such circumstances, the duty to intervene has been clearly established. *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

Accordingly, Buller, Tetrault, and Schreiner are not entitled to qualified immunity, and Cotto may recover damages from them personally.

E.  Invasion of Privacy

As a preliminary matter, I note that defense counsel made almost no mention of the invasion of privacy claim during his initial Rule 50(a) motion.[8] Accordingly, he has not adequately preserved objections regarding any potential failure of proof in Cotto's case. *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998) ("[T]he JMOL motion must at least identify the specific element that the defendant contends is insufficiently supported."). Accordingly, I decline to consider whether the charge was adequately supported by the evidence adduced at trial,[9] and instead consider only whether granting the defendants' motion is "necessary . . . to correct 'purely legal error.'" *Malmsteen v. Berdon, LLP,* 369 F. App'x 248, 249 (2d Cir. 2010) (citing *Fabri v. United Tech. Int'l, Inc.,* 387 F.3d 109, 119 (2d Cir. 2004)).[10]

Specifically, the defendants suggest that the privacy tort was foreclosed by the jury's finding of probable cause to arrest Cotto for his traffic violations as well as the positive alerts by the narcotics dog, which they assert also affirmatively provide probable cause. *Id.* at 53–54, 56; *see also Florida v. Harris*, _ U.S. _, 133 S. Ct. 1050, 1057–58 (2013) (instructing that a court "should find probable cause" based on a positive alert where there is proof that the dog performs reliably and the opposing party has failed to rebut that showing).

---

[8] The entire discussion of the invasion of privacy claim in the Rule 50 motion colloquy was as follows: "And then I suppose if we were to fashion something that picks up the scenario of two fingers penetrating a rectum, it would be the illegal search, it would be the invasion of privacy maybe? Although I'm not sure even that applies." Tr. at 511.

[9] Moreover, because the defendants assume that Fourth Amendment reasonableness is reasonableness *per se*, the defendants' factual arguments largely rely on the success of their approach in the previous sections. There is no need for me to revisit those arguments here. In addition, I note that the defendants' very assumption is questionable. They argue that because courts have held that a Fourth Amendment violation necessarily satisfies the elements of an invasion of privacy claim, the inverse proposition that Fourth Amendment reasonableness necessarily *does not* satisfy the tort requirements must also hold true. Defs.' Br. at 53. But as Cotto points out, the Fourth Amendment could be a floor for privacy rights rather than a ceiling. Pl.'s Opp'n Br. at 41–42. Accordingly, conduct that does not violate the U.S. Constitution might still trigger state law protections.

[10] The Second Circuit also recognizes an exception to correct "manifest injustice." *Malmsteen v. Berdon, LLP,* 369 F. App'x 248, 249 (2d Cir. 2010). Because the defendants do not assert any such gross error, however, I see no need to consider that exception.

As a matter of federal law, it is clear that the conduct of police officers is not generally immunized by the existence of probable cause. *See Galluccio*, 724 F.2d at 304. The defendants correctly point out, however, that certain state law torts *are* foreclosed by a finding of probable cause. Defs.' Br. at 54–55, 57. Several of their examples are not analogous to the present case because probable cause directly negates an element of the tort. For instance, the tort of malicious prosecution under Connecticut law requires a showing that "the defendant acted without probable cause." *Brooks v. Sweeney*, No. CV 06 5005224S, 2008 WL 5481203, at *2 (Conn. Super. Ct. Nov. 28, 2008)*, aff'd,* 299 Conn. 196, 9 A.3d 347 (2010) (citing *Lopes v. Farmer,* 286 Conn. 384, 389 (2008)). The tort of trespass similarly requires the *unlawful* entry on property, and probable cause clearly provides the requisite "lawfulness" to defeat that element. *Cf. Georgia v. Randolph*, 547 U.S. 103, 118 (2006) (dismissing as "silly" the suggestion that a police officer commits a trespass by reasonably entering a home to protect against a threat).

The tort of intentional infliction of emotional distress ("IIED") makes a better analogy to the privacy tort at issue in this case. State courts and courts in this district have held that an IIED claim arising out of the arrest itself may be foreclosed by a showing of probable cause. But those courts also routinely recognize the possibility that—much like the Fourth Amendment requires that a search be *both* justified and conducted in a reasonable manner—other factors might allow an arrest properly based on probable cause to give rise to tort liability. *See Zalaski v. City of Hartford*, 704 F. Supp. 2d 159, 176 (D. Conn. 2010) ("As a matter of law—absent other factors that may constitute 'extreme and outrageous' conduct—an arrest will not be considered intentional infliction of emotional distress if the arresting officer has probable cause to make the arrest."); *Washington v. Blackmore*, No. CV 06-5000704, 2008 WL 5156436, at *7 (Conn. Super. Ct. Nov. 10, 2008)*, aff'd,* 119 Conn. App. 218 (2010) (dismissing plaintiff's IIED claim

because he failed to allege that "the arrest was any more outrageous than a standard arrest");
*O'Brien v. Perry*, No. CV 980584503S, 1999 WL 124329, at *4 (Conn. Super. Ct. Feb. 19,
1999) (holding that public policy prevents IIED claims arising out of police conduct "to
effectuate an otherwise valid arrest *not involving the use of unreasonable force*") (emphasis
added); *see also McKelvie v. Cooper*, 190 F.3d 58, 63 (2d Cir. 1999) (reversing a grant of
summary judgment for the defendants on an IIED claim where the plaintiff alleged, *inter alia*, an
unreasonably aggressive examination and extended detention).

Adopting that logic, I determine that, although an arrest based on probable cause might
foreclose an invasion of privacy claim based on the arrest itself, in this case the highly public
manner in which the search was conducted constitutes an additional factor sufficient to allow the
state-law tort to proceed. The defendants do not point to any authority, nor could I find any,
holding that probable cause to arrest or even search immunizes subsequent constitutionally
*unreasonable* conduct from state law privacy torts. *See Lin v. Lozinski*, No. CIV. 300-CV-2045
(AHN), 2004 WL 1543194, at *7 (D. Conn. Mar. 1, 2004) (where defendant-officer had probable
cause to arrest and conduct some aspects of the search, dismissing invasion of privacy tort on the
elements). Moreover, it is unclear what public policy would be furthered by protecting from state
torts police officers who will nevertheless be subject to liability under federal law for their
unreasonable acts.

Accordingly, that portion of the verdict can stand. Further, I note that although the jury
did not apportion the damages by claim, to the extent that any of the damages might be based on
the privacy tort in particular, the defendants would not be protected by federal qualified
immunity. *Jenkins v. City of New York,* 478 F.3d 76, 86 (2d Cir. 2007) ("'Qualified immunity'
protects an official from liability under *federal* causes of action but is not generally understood to

protect officials from claims based on state law."). Because of the jury's award of punitive damages, which entails a necessary finding that the defendants acted with malice, Connecticut state law qualified immunity also would not apply. *See Violano v. Fernandez*, 280 Conn. 310, 319–20 (2006) (enumerating exceptions to immunity for a municipal employee, including that "liability may be imposed for a discretionary act when the alleged conduct involves malice, wantonness or intent to injure").

### F. Amount of Punitive Damages

The jury awarded Cotto a total of $60,000 in punitive damages, apportioned as follows: $40,000 from Davis, $10,000 from Tetrault, and $5,000 each from Buller and Schreiner. Although I have upheld the jury's substantive verdict, I determine that those numbers are excessive given the conduct at issue.

"If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996) (internal quotation marks and citation omitted). In determining whether an award of punitive damages is excessive, I must keep in mind that the purpose of punitive damages is to punish and deter. *Id.* The Supreme Court, in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), instructed that courts should consider three factors in an excessiveness inquiry:

> (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases.

*Lee*, 101 F.3d at 809 (quoting *Gore*, 517 U.S. at 575, and adopting its ruling in the federal context). Although the defendants did not formally object to the amount of punitive damages

awarded, I may review the size of the award for excessiveness and *sua sponte* offer remittitur as an alternative to a new trial. *Peterson v. Ctiy of Nassau*, 995 F. Supp. 305, 312 (E.D.N.Y. 1998) (citing *Bender v. City of New York*, 78 F.3d 787, 795 (2d Cir. 1996)).

First, I consider the "reprehensibility" of the defendants' conduct. *Gore* instructs that the mere fact that tort liability should be imposed does not mean that substantial punitive damages are also warranted. *Gore*, 517 U.S. at 580. Instead, I must consider whether there are aggravating factors that make the conduct particularly reprehensible and deserving of punitive damages, such as whether the defendant used violence; acted with deceit or malice; or has engaged in repeated misconduct. *Id.* at 575–76.

All of the defendants are police officers; their training in that role should have given them "notice as to the gravity of misconduct under color of [their] official authority," as well as the fact that such misconduct could leave to punitive damages. *Lee*, 101 F.3d at 811. The jury could reasonably have found that Davis acted with malice, and subjected Cotto to both physical discomfort and deep humiliation when he strip-searched Cotto on a cold night in full view of the public. Moreover, his conduct involved the abuse of special authority entrusted to him as a police officer. *See Lee*, 101 F.3d at 811. Additionally, the jury could reasonably have found that the search was racially motivated. *See Patterson v. Balsamico*, 440 F.3d 104, 121 (2d Cir. 2006) (observing that an assault was a "thoroughly reprehensible incident, particularly in light of its racial motivation"). In sum, his conduct is clearly reprehensible, albeit less so than the use of physical violence. *See id.* ("[P]hyiscal assaults generally demonstrate a higher degree of reprehensibility than nonviolent crimes.") (citing *Gore*, 517 U.S. at 575–76).

The jury also could reasonably have found that the other defendants acted with malice when they laughed at Cotto instead of intervening to protect his privacy during the search. The

jury's award correctly recognizes that, as the direct perpetrator of the search, Davis' actions were more culpable than the other defendants' inactions. The distinction drawn between Tetrault and Buller and Schreiner, however, is not supported on this ground—although Tetrault was closer to Davis during the search and provided him with a flashlight, those two details do not appear sufficiently more egregious to justify doubling the damages awarded against him.

I decline to consider the second *Gore* factor, regarding the ratio between the compensatory and punitive damages. As the *Lee* court pointed out, that factor is "not the best tool" where nominal damages have been awarded, and where the harm done is not easily translated to monetary terms. *Lee*, 101 F.3d at 811.

Finally, I consider awards in comparable cases. In *DiSorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2003), which involved an officer's use of egregious physical violence, the Second Circuit reduced the punitive damages award to $75,000, observing that number was "comparable to the upper limits of the punitive damages awarded in similar police brutality cases." *Id.* at 189. It follows that the $60,000 award in the present case—which does not involve acts of violence—is excessive.

Instead, the present case is more akin to *Wilson v. Aquino*, 233 F. App'x 73 (2d Cir. 2007), where the Second Circuit upheld an award of $25,000 in punitive damages without discussion. *Wilson* also involved a strip search conducted in an improper manner and accompanied by verbal abuse of the plaintiff. *Id.* at 77–78. The officers kicked and punched the plaintiff during the search, but they also conducted the search in a private office rather than in the cold on the public street. *Id.*

District court cases in this circuit also support the inference that a lower range of damages is appropriate in strip search cases. For instance, in *Gonzalez v. City of Schenectady*,

No. 1:00-CV-0824, 2002 WL 34945084 (N.D.N.Y. Dec. 30, 2002), a district court reduced the actual damages awarded for an unreasonable strip search conducted at the police station to $40,000, and upheld punitive damages against a by-standing female officer and supervisor in the amount of $2,500 and $10,000 respectively. *Id.* at *6–7. In *Kelleher v. New York State Trooper Fearon*, 90 F. Supp. 2d 354 (S.D.N.Y. 2000), a district court reduced the punitive damages awarded for an unjustified strip search conducted in private and apparently without other aggravating features to $25,000.  *Id.* at 364.

In light of the above, I order remittitur in the amount of $25,000 against Davis, and $2,500 each against Tetrault, Buller, and Schreiner. If Cotto fails to accept that amount within 30 days of this ruling by filing a motion with the court, I will schedule a new trial on the question of damages.

## IV.     Conclusion

For the foregoing reasons, the defendants' motion (doc. 168) is **denied** in its entirety, and the verdict in favor of Cotto is sustained. The amount of punitive damages is reduced as stated above.

So ordered.

Dated at Bridgeport, Connecticut, this 19th day of January 2016.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
